Filed 3/19/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ARNETTE TRAVIS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BILL BRAND et al., <br><br> Defendants and Respondents; <br><br> REDONDO BEACH WATERFRONT, LLC, et al., <br><br> Appellants. | B298104 <br><br> (Los Angeles County Super. Ct. No. BC665330) |
| ARNETTE TRAVIS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BILL BRAND et al., <br><br> Defendants and Respondents. | B301479 <br><br> (Los Angeles County Super. Ct. No. BC665330) |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge. Affirmed in part and reversed in part.

The Sutton Law Firm, Bradley W. Hertz, James R. Sutton and Nicholas L. Sanders for Plaintiffs and Appellants.

Shumener, Odson & Oh, Betty M. Shumener and John D. Spurling for Appellants in No. B298104.

Gabriel & Associates and Stevan Colin for Defendants and Respondents Bill Brand, Brand for Mayor 2017 and Linda Moffat.

Law Offices of Bobak Nayebdadash and Bobak Nayebdadash for Defendants and Respondents Wayne Craig and Rescue Our Waterfront, P.A.C.

Carlson & Messer and Jeanne L. Zimmer for Defendant and Respondent Nils Nehrenheim.

_____

This case is about a political campaign. In a Redondo Beach municipal election, a political action committee and two political candidates successfully campaigned for a ballot measure. After the vote, two citizens sued the committee and these candidates, claiming the candidates had controlled the committee, which had used an improper title for itself. The trial court vindicated the committee and the candidates and awarded them attorney fees. This consolidated appeal is from the judgment and the fee award. We reverse the judgment as to some nonparties and otherwise affirm.

I

This opinion features a rather large cast of actors. One way to introduce them is by their self-identified political affiliations. They differed over whether to support or oppose a large redevelopment of the Redondo Beach municipal waterfront.

2

A judicial opinion described this political contest. (See *Redondo Beach Waterfront, LLC v. City of Redondo Beach* (2020) 51 Cal.App.5th 982, 986–990 (*Waterfront*).) In particular, forces opposing the redevelopment backed a so-called Measure C. Those favoring the redevelopment opposed Measure C.

Two citizens of Redondo Beach, Arnette Travis and Chris Voisey, opposed Measure C and favored the redevelopment. Travis and Voisey are the plaintiffs and appellants. They sued a political action committee and two candidates. The political action committee is Rescue Our Waterfront, which we shorten to "Rescue." The candidates are Redondo Beach Mayor Bill Brand and Redondo Beach City Councilmember Nils Nehrenheim. Travis and Voisey also sued Wayne Craig, a principal officer of Rescue. Travis and Voisey additionally sued Brand's mayoral campaign committee, as well as its treasurer, Linda Moffat.

All these defendants—Rescue, Brand, Nehrenheim, Craig, the campaign committee, and Moffat—are now respondents in this appeal.

As we will explain, the trial court entered judgment against plaintiffs Travis and Voisey and awarded attorney fees against them. Travis and Voisey appeal the judgment and the fees.

Nonparties Redondo Beach Waterfront, LLC (Waterfront), Fred Bruning, and Jean Paul Wardy also appeal the judgment. Bruning and Wardy were the principals for Waterfront and for CenterCal Properties, LLC (CenterCal). CenterCal is a developer the city of Redondo Beach selected in 2012 for proposed redevelopment of the city's waterfront. We call Waterfront, Bruning, and Wardy collectively the nonparties.

We summarize Redondo Beach's March 7, 2017 election.

On June 28, 2016, Craig, Nehrenheim, and one Martin Holmes submitted a "Notice of Intent to Circulate Petition" to the city of Redondo Beach seeking to place a local initiative—the King Harbor Coastal Access, Revitalization, and Enhancement Initiative, later designated Measure C—on the ballot for the next election. They succeeded: Measure C indeed was on the ballot for this election. Measure C aimed to limit development and to roll back the waterfront redevelopment project.

On July 1, 2016, Craig and Holmes signed a "Statement of Organization" form designating Rescue as both a "general purpose" and a "primarily formed" committee. It also indicated Rescue was not a controlled committee. The Secretary of State rejected the form because Rescue could be general purpose or primarily formed but not both.

The "general purpose," "primarily formed," and "controlled" classifications are fundamental to the merits of this case. We thumbnail these terms now and give more comprehensive definitions later. General purpose committees support or oppose more than one candidate or ballot measure. (Gov. Code, § 82027.5.) Primarily formed committees support or oppose a single candidate, single measure, multiple candidates in a single election, or multiple measures in a single election. (§ 82047.5.) A committee can be either general purpose or primarily formed. Either type of committee may also be candidate-controlled, which means a candidate has significant influence over the committee. (§ 82016.)

Why do the designations matter? We looked to the law's purpose for answers. The Political Reform Act was a voter-approved initiative on California's 1974 primary election ballot. (Gov. Code, § 81001.) The law's findings noted costs of election

4

campaigns had recently surged, expressed concern about the disproportionate influence of wealthy people and organizations on governmental decisions, and found previous disclosure requirements had been inadequate. (*Ibid.*) At trial, Travis and Voisey's expert said the law's disclosure requirements are meant to help the public make informed voting decisions. These general principles, however, tell us little about this particular and narrow issue of categorization.

The main disclosure in this case appears to be in the committee name. Committees primarily formed to support or oppose a measure must say so in their name, for example "No on Measure A." (Gov. Code, § 84107; Cal. Fair Pol. Practices Com., Committee Naming Requirements, at <https://www.fppc.ca.gov/content/dam/fppc/NS-Documents/TAD/Campaign%20Documents/Committee_Naming_Requirements.pdf> [as of March 17, 2021], archived at <https://perma.cc/8VBH-G8GP>.) Similarly, a controlling candidate's name is part of the committee's name. (Cal. Code Reg., tit. 2, § 18521.5.) Travis and Voisey's lawyer sought to explain why the name mattered in his closing argument at trial: Rescue's name "deceived" voters by hiding that Rescue was primarily formed to support Measure C and was controlled. Without the deception, the committee may not have gotten the same level of financial and voter support. We understand this argument to be about voters' relative trust in each type of committee. The hypothesis must be that voters are more willing to trust general purpose committees, which are oriented to general and long-term ideals, like supporting slow-growth development. Conversely, the supposition must be that voters are warier of primary purpose committees, which may exist only

briefly and thus lack accountability, and may be opportunistically and singularly driven to pass a measure. Similarly, the hypothesis must be that voters have more trust in committees that are independent from candidates. This at any rate appears to be the general idea.

We turn back to Rescue. It corrected and resubmitted its form in August 2016. The corrected form designated Rescue a general purpose committee. Craig and Holmes described their plan for Rescue's activities on the form: "Support candidates & ballot measures to preserve the Redondo Beach Coastal zone and related activities." Craig and Holmes left the "Controlled Committee" section blank, indicating Rescue was not a candidate-controlled committee.

Measure C passed in the March 7, 2017 election. Division Three of this appellate district later affirmed a declaratory judgment, however, that Measure C could not restrict Waterfront's statutory vested rights for this project. (*Waterfront*, *supra*, 51 Cal.App.5th at pp. 994–999.)

In the same election, Brand won his bid for mayor. Nehrenheim qualified for a run-off election and later won a seat on the city council.

On June 15, 2017, Travis and Voisey filed a complaint alleging the defendants violated the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) and related regulations.

The complaint included two main issues, both related to the March 7, 2017 election and Measure C.

The first issue was about Rescue's purpose. Travis and Voisey alleged Rescue was not a general purpose committee but a primarily formed committee, which its founders created to support Measure C. Travis and Voisey contended the law thus

6

required Rescue, as a primarily formed committee, to include words like "Yes on Measure C" in its name. Additionally, Rescue could not have categorized expenditures to support Measure C as independent expenditures.

The second issue was about whether Brand and Nehrenheim controlled Rescue. Travis and Voisey alleged Brand and Nehrenheim "exerted significant influence and control over" Rescue and were "controlling candidates." According to Travis and Voisey, the candidates improperly "failed to disclose [their] controlling candidate status on their campaign reports."

Travis and Voisey sought injunctive relief compelling the defendants to comply with the Political Reform Act.

A five-day bench trial began November 14, 2018. Eleven witnesses testified.

Travis and Voisey testified they were residents of Redondo Beach and followed local politics.

Craig, principal officer and treasurer of Rescue, testified that he and Holmes formed Rescue. They intended Rescue to support multiple activities, candidates, and ballot measures related to the Redondo harbor area. Selecting both "general purpose" and "primarily formed" on Rescue's initial Statement of Organization was "an error in completing the form." He and Holmes corrected and resubmitted the form to say Rescue was a general purpose committee based on guidance from the California Fair Political Practices Commission (the Commission). At the time of the trial, Rescue had supported Measure C, at least four candidates, a California Environmental Quality Act lawsuit, and two coastal submission appeals. It had also campaigned against many candidates. Craig believed another organization, Build a

Better Redondo, and one Jim Light drafted the text that became Measure C.

Craig said Rescue supported Measure C through a number of activities. It paid to publish its title, summary, and notice in a local newspaper; it printed petitions; and it paid for signature gatherers to circulate the petitions. It also paid for yard signs, door hangers, and mailers in favor of Measure C. Rescue and its volunteers knocked on doors and made phone calls in favor of Measure C. Craig said people passed out "other material" in favor of Measure C that was unrelated to Rescue. Several candidates also campaigned in support of the measure.

Craig said no candidate ever directed or controlled Rescue. He did not talk to Brand or Nehrenheim about advertising for Measure C. Rescue did not share office space with Brand or Nehrenheim. No candidate had access to Rescue's money. Rescue distributed a mailer that supported Measure C and four candidates, including Brand and Nehrenheim. Most of Rescue's events were just for Rescue, but it had one fundraiser with Brand and Nehrenheim in November 2016.

Nehrenheim testified. He did not work on Rescue's efforts to get Measure C passed. He did not strategize with Craig on Rescue's activities related to Measure C. Nehrenheim helped cowrite the initiative that became Measure C by gathering information and data related to the measure. He gave that information and data to others, including Light, and a lawyer drafted the legal language of the measure. Nehrenheim helped collect signatures in support of placing the measure on the ballot. His campaign literature expressed support for Measure C, but he did not work with Craig on any messaging about Measure C.

Brand testified. He denied having control or significant influence over Rescue. Like Nehrenheim, Brand helped collect signatures in support of placing Measure C on the ballot. Although he placed newspaper advertisements in support of Measure C, Brand did not discuss the advertisements with Rescue before he placed them. Although Rescue included messaging about Brand on some of its mail pieces, Brand did not interact with Rescue regarding those mailers. Brand did not see any of Rescue's advertisements that supported him before the advertisements went public.

In January 2017, Brand sent an email to Craig saying he could not assist with Rescue's strategy or fundraising. Craig responded and included Nehrenheim and several other people on the response. Craig agreed with Brand and said Rescue "is not coordinating with any candidate." Craig noted none of the candidates should be included in Rescue's communications. Brand distributed some of the funds he raised at a single fundraiser to Rescue but Brand had "organized the whole thing." Brand included any contribution he made to Rescue or to other candidates in his campaign statements.

Brand shared with Rescue his subscription to an online program that provides information about voters. That program charged Brand if a user selected a voter population. Brand did not require Rescue to reimburse the charges it accrued. Brand disclosed these charges as nonmonetary contributions to Rescue. He did not communicate with Rescue to strategize about how Rescue should use the database.

Ann Ravel testified as an expert for Travis and Voisey. She formerly chaired the Commission.

Ravel concluded Rescue was a primarily formed committee. She said Rescue's spending met a threshold that made it a primarily formed committee but she did not have documentation to support her calculations at trial. She agreed Travis and Voisey's own attorneys had calculated Rescue's total political spending between July 1, 2016 and December 31, 2016 to be $9,758.09.

Ravel also concluded Brand and Nehrenheim were controlling candidates of Rescue. She based her opinion that Brand and Nehrenheim coordinated with Rescue in part on "an assumption." She agreed she did not have any "specific facts" that Brand gave Rescue advice about Rescue's communications. She agreed the candidates were allowed to take out advertisements in support of Measure C. Ravel agreed Brand and Nehrenheim were not honorary chairpersons or voting members of Rescue. She agreed a candidate can solicit funds for a committee and can speak at events for a committee without having significant influence over the committee. Ravel agreed a candidate can provide a committee access to the candidate's contribution list and not have significant influence over the committee.

Ravel did not know who would be paying her expert fees.

After the plaintiffs rested, the defendants called Travis and Voisey a second time and asked about the lawsuit's funding.

Travis said she filed the lawsuit because she felt the defendants' conduct was "disingenuous, at best, deceitful." As of trial, she had not paid any money toward the prosecution of the case. Travis did not know the payment arrangement she had with her lawyers. She said she did not talk to Bruning about

10

filing the lawsuit. She did not think CenterCal was paying for the prosecution of the case.

Like Travis, Voisey said he had not paid any court-related costs in connection with the case. Voisey said he had not discussed "any final numbers or anything" for the payment of his attorneys. He recalled signing a retainer agreement. Voisey said he was not aware of any arrangements in which anyone promised to pay for the cost of the prosecution of the case. He said he did not have any discussions with Bruning before he filed the lawsuit.

Amber Maltbie testified as a defense expert. A large part of her practice at a private law firm was reviewing campaign statements of political action committees and candidates. She had handled legal matters involving primarily formed and general purpose committees.

Maltbie said Rescue was a general purpose committee and it never became a primarily formed committee. She calculated Rescue made about $7,138 in political expenditures in 2016.

Maltbie believed Rescue was not a primarily formed committee for Measure C based on its other activities and based on Craig's testimony.

Maltbie said Rescue needed to review its expenditures at the end of 2016 because it had reason to know almost all of its political expenditures were in support of Measure C. Because its total spending was less than $10,000 at that time, however, Rescue did not need to change its status.

Even if Rescue's expenditures exceeded the threshold by the end of March 2017, Maltbie said the election was over and there would be no need to make the name change. She based this opinion on a Commission advice letter. In her experience, it is

standard practice that general purpose committees need not amend their forms to change their name on campaign Statements of Organization after an election.

Rescue was allowed to make one of two different calculations in its March 2017 review: (1) it could look at the current two-year period, starting at January 1, 2017, and consider what it planned to do in the future, or (2) it could look back at the immediately preceding 24 months. Maltbie said Rescue could use the first method and consider its anticipated future plans and spending.

She noted that Rescue continued to operate at the time of trial, November 2018. If Rescue had shuttered its operations immediately after the election, that would have tended to show it was primarily formed.

Maltbie offered an explanation for Rescue's initial flawed Statement of Organization. She noted the form could be confusing. Rescue's form showed it was a new committee that planned to support multiple candidates and ballot measures. Its first goal was to support the initiative that became Measure C, but that did not necessarily make it primarily formed. Any committee would "have to start somewhere."

Maltbie believed neither Brand nor Nehrenheim controlled Rescue at any time. Brand and Nehrenheim were visible supporters of Measure C but Maltbie did not see any evidence the candidates strategized with Rescue. She found no evidence the candidates had directed Rescue's activities. The evidence did not show key characteristics of control like having influence over the committee's strategy, influencing the committee's decisionmaking about how it spent money, acting jointly with the committee on its expenditures, making substantial fundraising efforts for the

12

committee, serving as voting members of the committee, or holding media events together with the committee.

Maltbie said the evidence, including Brand's and Rescue's emails, also showed the candidates and Rescue sought and implemented advice to ensure the candidates would not become controlling candidates.

The defendants called Travis and Voisey's attorney, Bradley Hertz, to testify. Hertz objected, stating there was no subpoena and citing the attorney-client privilege. The court ordered Hertz to the stand and allowed the defendants to ask Hertz about the lawsuit's funding.

Hertz said his clients were Travis and Voisey but Waterfront was paying for the lawsuit. Hertz identified Bruning and Wardy as the principals of Waterfront and of CenterCal Properties, LLC. CenterCal was one of the entities involved in the redevelopment of the pier that Measure C sought to affect.

After Hertz testified, Brand's attorney moved to dismiss the lawsuit because "the real party in interest in prosecuting this case is [Waterfront], which does not have standing." The court denied the motion and said "[w]e'll face the real issues on the case."

In closing argument, Hertz explained, "the activities themselves were legal. It was the way the committees were named and the way the activities were described that really was where the deception was, in our view, and where the violations were and what needs to be amended."

Hertz said the defendants engaged in an "attack[] on the voters of Redondo Beach," a "sneak attack," and the campaign was a "Trojan Horse." Hertz said Rescue's name seemed "kind of a safe term," which hid that Rescue was primarily formed to

13

support Measure C.  Additionally, Hertz said, Brand and Nehrenheim needed to have their name in the name of the committee, which "could have and very well would have had a large impact."  Hertz said the "deception" will continue unless the court required amendments and required accurate filing in the future.  Rescue committed "fraud" because its initial form indicated it was primarily formed.

The court made oral findings during closing arguments.  It found Rescue to be a general purpose committee.  "I don't feel that they have violated the law."  The court also made an oral finding that Brand and Nehrenheim did not exert significant influence over Rescue and did not control Rescue.

The defendants submitted a proposed judgment.  Travis and Voisey objected.  The defendants replied.  On January 2, 2019, Travis and Voisey responded and submitted supporting declarations.  The declarations said Travis and Voisey had given informed written consent for Waterfront to fund the litigation on their behalf before they filed the case.

The court entered judgment in favor of each of the defendants and against each plaintiff on April 3, 2019.

The judgment included several findings.

The court found Rescue was formed as a general purpose committee, never became a primarily formed committee, and was not a controlled committee.  Brand, Nehrenheim, and Brand's treasurer, Moffat, never controlled Rescue or Craig.  Nor did Brand, Nehrenheim, or Moffat exert significant influence over Rescue or Craig's decisions, actions, or expenditures.

As the prevailing parties, the court awarded each of the defendants costs, including attorney fees, against Travis and Voisey.

14

The court made additional findings about the plaintiffs. Travis and Voisey were " 'shills' for [Waterfront] and its principals, Fred Bruning and Jean Paul Wardy who initiated the instant lawsuit against Defendants and directed and financed the prosecution of this case against each of the Defendants." Waterfront, Bruning, and Wardy "were the true entity and persons behind the lawsuit and were responsible for paying Bradley W. Hertz, Esq., and his law firm, The Sutton Law Firm, to initiate and prosecute the instant action against the Defendants, while using Plaintiffs Arnette Travis and Chris Voisey as sham clients and shell Plaintiffs. Therefore, the Court makes a ruling that the Judgment entered in favor of the Defendants is further entered as against judgment debtors Fred Bruning, Jean Paul Wardy and [Waterfront], and each of them."

The court signed a 29-page statement of decision reflecting the same findings. It found Rescue was not involved in running the principal campaign for Measure C and there was no principal campaign for the measure. The court "found Defendants and their expert witness to be credible."

On May 30, 2019, Travis and Voisey filed a timely notice of appeal from the judgment. The nonparties separately filed a timely notice of appeal from the judgment.

On June 27, 2019, the court held a hearing about costs and attorney fees. The court said it would grant the defendants' motions for costs and fees except as to discretionary multipliers.

On August 7, 2019, the court signed an order awarding a total of $896,896.60 in fees and costs against Travis and Voisey. The attorney fee portion of the award was $862,736.60. The fee award was pursuant to Code of Civil Procedure section 1021.5 and Government Code section 91003.

On October 2, 2019, Travis and Voisey filed a timely notice of appeal from the order for attorney fees and costs.  Their appellate briefs challenge the attorney fees portion of the award, only.

## II

We have consolidated the two appeals for purposes of decision.

## A

As a preliminary matter, we address the contention by the respondents that the nonparties lack standing to appeal the judgment.  (The respondents moved to dismiss the nonparties from the appeal and raised the appellate standing argument in their briefs.)

The nonparties have standing.

Generally, to have standing to appeal a judgment, an appellant must be (1) a party of record and (2) aggrieved by the challenged judgment.  (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736 (*Carleson*); see also Code Civ. Proc., § 902.)

There is an exception to the "party of record" requirement if the judgment has a "res judicata effect" on the nonparty.  (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295 (*Marsh*).)  *Marsh* did not provide a detailed explanation of "res judicata effect" but it interchangeably used the term "binding." (*Id.* at p. 295–296 [expert witness had standing to appeal order setting his deposition testimony fee because order bound him.])

Res judicata, or claim preclusion, describes the preclusive effect of a final judgment on the merits.  It requires three elements:  (1) the same cause of action; (2) between the same parties, or parties in privity; and (3) a final judgment on the

16

merits. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.)

As to the second requirement for standing, a judgment aggrieves a person if it has an " 'immediate, pecuniary, and substantial' " injurious effect on the person's rights or interests. (*Carleson, supra,* 5 Cal.3d at p. 737.)

We liberally construe standing and resolve doubts in favor of the right to appeal. (E.g., *Vitatech Internat., Inc. v. Sporn* (2017) 16 Cal.App.5th 796, 804.)

The nonparties were not a party of record, but the judgment arguably has a res judicata effect on them. The judgment found in favor of each defendant and against each plaintiff. It also found the nonparties "were the true entity and persons behind the lawsuit." The court ordered its judgment to be "further entered as against judgment debtors Fred Bruning, Jean Paul Wardy and [Waterfront], and each of them."

Both sides offer internally inconsistent arguments about whether the judgment binds the nonparties.

In their opening brief, the nonparties rely on *Marsh* and properly cite that case's requirement that a judgment both *bind* and aggrieve a nonparty for the nonparty to have standing. They also contend the trial court's actions affected their pecuniary interests. In their reply brief, however, the nonparties assert they "cannot be bound by the Judgment."

The respondents similarly make contradictory arguments, stating the nonparties knew Travis and Voisey's suit "would potentially bind them," but asserting the nonparties lack standing and the judgment does not aggrieve them.

Resolving doubts in favor of the right to appeal, we agree with the nonparties that they have satisfied the first requirement

17

for standing.  The judgment aggrieves the nonparties.  It awarded costs, including attorney fees, to the defendants.  As we noted, this judgment was entered against the nonparties.  The fees and costs near $1 million and are immediate, pecuniary, and substantial.  This burden aggrieves the nonparties.

The respondents' arguments as to why the nonparties lack standing are unavailing.  One argument maintains the nonparties are not aggrieved because the attorney fee order does not reference them.  This ignores the judgment, drafted by the respondents, that awards fees to them and says the judgment is entered against the nonparties, whom it calls "judgment debtors."  The judgment suggests the respondents can seek their fees from the nonparties.  Thus the nonparties are aggrieved notwithstanding the language of the attorney fee order.

The respondents also incorrectly contend the nonparties had to file in the trial court a motion to set aside and vacate the judgment under Code of Civil Procedure section 663.  That section permits but does not require an aggrieved party to file such a motion.  (*Marsh*, *supra*, 43 Cal.App.4th at p. 295 [explaining "res judicata effect" exception to party of record requirement].)

To support their argument the nonparties had to move to set aside the judgment before appealing, the respondents cite *Hassell v. Bird* (2016) 247 Cal.App.4th 1336, but that case created no such mandate.  We note the Supreme Court overturned that judgment in *Hassell v. Bird* (2018) 5 Cal.5th 522, but the high court said it expressed no view about portions of the Court of Appeal's decision outside its grant of review, like the appellate court's standing analysis.  (*Id.* at p. 531, fn. 6.)  The Court of Appeal's decision in *Hassell* said a particular party

18

became a party of record by filing a nonstatutory motion to vacate an order.  (*Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1353.)  The court did not say this was the only way to gain appellate standing.

We follow *Marsh*.  The nonparties have standing to appeal.  We deny the respondents' motion to dismiss the nonparties.

### B

We turn now to the merits of the case:  was the court right to find that Rescue was a general purpose committee and that neither Brand nor Nehrenheim controlled it?  We define the standard of review and then tackle the issues of purpose and control.

### 1

We review the trial court's factfinding for substantial evidence.  This traditional standard of review is highly deferential.  It has three pillars.  First, we accept all evidence supporting the trial court's order.  Second, we completely disregard contrary evidence.  Third, we draw all reasonable inferences to affirm the trial court.  These three pillars support the lintel:  we do not reweigh the evidence.  If substantial evidence supports factual findings, those findings must not be disturbed on appeal.  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581 (*Schmidt*).)

Travis and Voisey incorrectly assert the standard of review is independent.  This assertion is a disguised and improper request for us to reweigh the evidence.  For example, Travis and Voisey say Craig's testimony "strains credulity, it doesn't pass the 'smell test.' "  The trial court accepted Craig's testimony as credible.  We will not disturb this or other findings supported by substantial evidence on appeal.  (See *Schmidt*, *supra*, 44

19

Cal.App.5th at p. 582 [trial judge is sole judge of witness credibility in a bench trial and credibility determinations receive "extremely deferential review"].)

2

Substantial evidence supports the court's finding Rescue was a general purpose committee.

A general purpose committee is "formed or exists primarily to support or oppose more than one candidate or ballot measure." (Gov. Code, § 82027.5.)

In contrast, a primarily formed committee is "formed or exists primarily to support or oppose any of the following:  (a) A single candidate.  (b) A single measure.  (c) A group of specific candidates being voted upon in the same . . . election.  (d) Two or more measures being voted upon in the same . . . election."  (Gov. Code, § 82047.5.)

Regulations provide additional specifications about when a general purpose committee must change its status to primarily formed.  Travis and Voisey alleged Rescue was primarily formed to support a single measure, so we focus on that type of primarily formed committee.  A committee is primarily formed to support a single measure if:

> (1) the committee "is created for or is involved in running the principal campaign for or against" the measure; or
> (2) the committee's "primary purpose and activities are to support or oppose" the measure; or
> (3) the committee "makes more than 70 percent of its total contributions and expenditures on all candidates and measures (not including administrative overhead)" on the measure during specified time periods.  (Cal. Code Reg., tit. 2, § 18247.5, subd. (c).)

20

The third area of inquiry requires further explanation. If a committee has reason to know it is close to triggering the 70 percent threshold, it must review its expenditures quarterly, at the end of March, June, September, and December, to determine whether it is primarily formed. (Cal. Code Regs., tit. 2, § 18247.5, subd. (d)(1).)

There is a spending minimum for this rule to apply. Even if the quarterly review shows a committee made more than 70 percent of expenditures for a single measure, "[a]n existing general purpose committee is not required to change its filing status to a primarily formed committee unless it . . . makes . . . at least $10,000 of contributions and/or expenditures." (Cal. Code Regs., tit. 2, § 18247.5. subd. (f)(2).)

To repeat, the regulations lay out three situations that require a general purpose committee to reclassify itself as a primary purpose committee. These are: (1) the committee was created for or is involved in the primary campaign for a measure; (2) the committee's primary purpose and activities are for the measure; or (3) over 70 percent of the committee's political expenditures go to the measure and the committee's total political expenditures are at least $10,000.

Analysis of these three factors shows the trial court could properly determine Rescue was a general purpose committee that did not need to reclassify itself.

First, Rescue's founders created the committee to support and oppose more than one candidate or ballot measure. In other words, they created it to be a general purpose committee. Craig said he and Holmes formed Rescue to support multiple activities, candidates, and ballot measures related to the Redondo harbor area. Rescue's corrected Statement of Organization designated

21

Rescue a general purpose committee and stated the committee planned to "[s]upport candidates & ballot measures to preserve the Redondo Beach Coastal zone and related activities." Besides Measure C, Rescue had supported at least four candidates, a California Environmental Quality Act lawsuit, and two coastal submission appeals. It had also campaigned against many candidates. After the election and as of trial, Rescue remained in existence.

The fact Rescue initially submitted a form designating itself as a general purpose *and* as a primarily formed committee is not of overwhelming significance. An innocuous explanation in support of the judgment is that Rescue's founders made an innocent initial error on a confusing form, but later realized and corrected their error. We agree this form could be confusing. According to Craig, Rescue's founders made an error, which they later fixed, based on guidance from the Commission.

The first factor is also about whether Rescue was involved in running the principal campaign for Measure C. Substantial evidence supports the court's finding that it was not. The court found there was no principal campaign for the measure. Several candidates supported the measure and Craig said people passed out "other material" in favor of Measure C. The fact Craig and Rescue did not draft the text that became Measure C further buttresses this finding.

In sum, substantial evidence showed its founders created Rescue to be a general purpose committee and it was not involved in running the principal campaign for Measure C, which means the first factor favors Rescue.

Second, Rescue's primary purpose was not to support Measure C for, as we have recounted, Rescue was involved in

many different activities. Rescue's performance of a number of activities in support of Measure C does not necessarily make it a primarily formed committee.

Third, we turn to Rescue's expenditures, which do not prove it was primarily formed.

Rescue had reason to know it was triggering the 70 percent threshold and needed to review its expenditures at the end of September 2016, December 2016, and March 2017. The election took place in the first week of March 2017.

Regardless of the proportion of expenditures, the September 2016 and December 2016 reviews would not have required Rescue to change its filing status. Rescue would only need to change its status if it had made $10,000 or more in expenditures. (Cal. Code Regs., tit. 2, § 18247.5, subd. (f)(2).) Maltbie calculated Rescue made about $7,138 in political expenditures in 2016. Travis and Voisey's own attorneys had calculated Rescue's total political spending between July 1, 2016 and December 31, 2016 to be $9,758.09 and their expert did not produce a different figure at trial. Thus the first two review periods did not require Rescue to change its status.

Travis and Voisey incorrectly maintain the $10,000 spending minimum does not apply because Rescue was "from its inception" a primarily formed committee. This argument fails because, as we explained, substantial evidence supported a finding Rescue formed as a general purpose committee.

The review at the end of March 2017 did not require Rescue to change its status either.

Rescue says even if it spent over $10,000 and made more than 70 percent of its political expenditures for Measure C as of the end-of-March review, it would not need to amend its

23

statements and designate itself a primarily formed committee because the election was over.  We need not decide this question because the regulations provide a procedure for deciding whether a committee must change its designation.

To determine using the 70 percent threshold whether a committee is primarily formed, "a committee must count contributions and expenditures made to support or oppose candidates or measures during whichever of the following time periods most accurately *reflects the current and upcoming activities* of the committee:  (A) The immediately preceding 24 months; or (B) The current two-year period, beginning with January 1 of an odd-numbered year and ending with December 31 of the following even-numbered year."  (Cal. Code Regs., tit. 2, § 18247.5. subd. (d)(3), italics added.)

At the end of March 2017, Rescue could find the latter period more appropriate.  It had existed for fewer than 24 months.  It planned other and different activities after the election.  Thus Rescue could find the appropriate time period to be from January of the odd-numbered year, January 1, 2017, through December 31, 2018.

The respondents' expert discussed this argument at trial and these parties raised it in their appellate briefing.  Travis and Voisey ignore the argument and thereby effectively concede this point:  the regulations entitled Rescue to consider its expected future expenditures on upcoming activities.  Thus Rescue could properly determine that between January 1, 2017 and December 31, 2018, it expected its expenditures in support of Measure C, a Measure on the March 2017 ballot, to comprise less than 70 percent of its political expenditures.  It therefore did not need to amend its status in March 2017.

Substantial evidence thus showed Rescue was a general purpose committee.

3

Substantial evidence supports the court's finding Rescue was not a controlled committee.

We begin by describing some law concerning candidate-controlled committees.  A candidate-controlled committee is "a committee that is controlled directly or indirectly by a candidate . . . or that acts jointly with a candidate . . . in connection with the making of expenditures." (Gov. Code, § 82016.)  Candidates control a committee if they have "a significant influence on the actions or decisions of the committee."  (*Ibid.*)

Regulations set rules for a controlled committee, including the requirement a controlling candidate's name is part of the committee's name.  (Cal. Code Reg., tit. 2, § 18521.5.)

To repeat, a committee can be candidate-controlled under either of two analyses:  (1) the candidate directly or indirectly controls the committee or (2) the candidate acts jointly with the committee in making expenditures.

Neither analysis implicates Brand, Nehrenheim, or Rescue.

Sufficient evidence, including Craig's and the candidates' testimony, showed neither Nehrenheim nor Brand controlled Rescue.  Craig said no candidate ever directed or controlled Rescue.  Craig did not talk to Brand or Nehrenheim about advertising for Measure C.  Nehrenheim did not work on Rescue's efforts to get Measure C passed.  He did not strategize with Craig on Rescue's activities related to Measure C.  Brand did not control Rescue nor have significant influence over Rescue. Rescue did not share office space with Brand or Nehrenheim.

25

The candidates did not control or have significant influence over Rescue's messaging. Rescue distributed a mailer that supported Measure C and four candidates, including Brand and Nehrenheim, but that is not dispositive as Craig said he did not talk to Brand or Nehrenheim about advertising. Brand said he did not interact with Rescue regarding those mailers and he saw the advertisements only after they went public.

The evidence showed Nehrenheim, Brand, and Rescue knew about the controlled-candidate committee issue and took affirmative steps to avoid the problem. Brand's January 2017 email said he could not assist with strategy or fundraising for Rescue. Craig's email response agreed with Brand, said Rescue "is not coordinating with any candidate," and noted Rescue's communications should include none of the candidates. We make inferences in support of the judgment, which means this email tends to show the candidates and Rescue acted based on their stated intent. The emails bolster the finding that the candidates did not control Rescue.

Ample evidence demonstrated neither candidate acted jointly with Rescue in making expenditures. Craig testified no candidate had access to Rescue's money. Maltbie found no evidence the candidates acted jointly with the committee on its expenditures.

Evidence about one fundraiser and about Brand's expenditures does not prove the candidates made joint expenditures with Rescue. Most of Rescue's events were just for Rescue, but it had one fundraiser with Brand and Nehrenheim. Brand independently organized the event and distributed some of the funds he raised to Nehrenheim, Rescue, and others. Brand included these and other contributions in his campaign

26

statements.  He also disclosed a nonmonetary contribution to Rescue of access to his account to a program with voter data.  He did not communicate with Rescue to strategize about how Rescue should use the database.  The plaintiffs' expert agreed these disclosed contributions, by themselves, were not illegal.

Nehrenheim and Brand wanted Measure C to pass.  They made no effort to hide this fact.  Both helped collect signatures in support of placing Measure C on the ballot.  But wanting the measure to pass is different from controlling Rescue.  Nehrenheim's campaign literature expressed support for Measure C, but he did not work with Craig on any messaging about Measure C.  Brand placed newspaper advertisements in support of Measure C, but he did not discuss with Rescue before he made such advertisements.  The candidates' public support for Measure C did not mean they controlled Rescue.

Substantial evidence showed Brand and Nehrenheim did not control Rescue.

C

The court erred by entering judgment against the nonparties.

The court acted beyond its authority by issuing a judgment against nonparties to the action.  The Second District, Division One, analyzed this issue in *Moore v. Kaufman* (2010) 189 Cal.App.4th 604.  In *Moore*, the court found a judgment against the plaintiff's counsel was void because that attorney was not a party to the action.  (*Id.* at pp. 615–616.)  The opinion quoted the Witkin treatise, which says, "A judgment in favor of a person who is not a party to the action is obviously beyond the authority of the court."  (2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction,

27

§ 315, p. 927.)  The trial court in this case also acted beyond its authority by issuing judgment against the nonparties.

The ruling implicated due process.  The nonparties had notice the case was ongoing but no notice the judgment could include them.  The nonparties funded the suit, but people funding lawsuits enjoy due process rights.  California has no public policy against funding of litigation by outsiders.  (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1136.)

The respondents have forfeited their argument that Travis, Voisey, and Hertz acted as the nonparties' agents.  They raise this contention for the first time on appeal.  Travis and Voisey objected to the proposed judgment's findings that they were "shills" and said the court could not enter judgment against the nonparties.  The respondents replied.  The thrust of this reply about the nonparties was that the judgment could include the nonparties because they were "intimately involved in funding and prosecuting this action secretly."  The respondents said nothing about an agency relationship.  They cited no agency law.

The respondents now incorrectly say the court "concluded the agency existed."  This is inaccurate.  The judgment did not use the words "agency" or "agent."  The court's finding that Travis and Voisey were "shills" is not a legal designation.  It was not a finding of an agency relationship.

Finally, the respondents raise arguments about a hypothetical SLAPP motion.  This argument remains a hypothetical.  It does not extend the trial court's power to enter judgment against nonparties.

The judgment is void as to the nonparties.

D

We affirm the court's award of attorney fees.

28

Often the issue with an attorney fee is the amount: did the court correctly calculate the hours, the hourly rate, and the total award? In that situation, the standard of review for attorney fee awards is for abuse of discretion. (E.g., *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 (*Connerly*).)

Travis and Voisey appeal the fee award against them, but they confine their attack to the basis for any fee award. They do not say the court's fee calculation was inaccurate in size. Instead, Travis and Voisey contend a fee award of even one cent was improper. Their argument thus is fundamental: it goes to entitlement, not amount. This requires us to construe the statutory requirements for an attorney fee award. Thus our review is independent. (See *Connerly*, *supra*, 37 Cal.4th at p. 1175.)

The trial court awarded fees under Government Code section 91003 and under Code of Civil Procedure section 1021.5. Travis and Voisey challenge the respondents' entitlement to fees. The two statutes are alternative bases for the fee award. We affirm the award under Government Code section 91003. We need not and do not reach Code of Civil Procedure section 1021.5.

With our italics, subdivision (a) of Government Code section 91003 provides, "The court *may* award to a *plaintiff or defendant who prevails* his costs of litigation, including reasonable attorney's fees." This section applies to cases seeking injunctive relief to enjoin violations or to compel compliance with the provisions of the Political Reform Act. (§ 91003, subd. (a).) The section applies because Travis and Voisey sought injunctive relief under that law.

The respondents prevailed against Travis and Voisey at trial.  Yet Travis and Voisey argue section 91003 does not support the fee award in favor of these prevailing defendants.

Travis and Voisey claim they must pay fees only if their lawsuit was "frivolous, unreasonable, or without foundation."  For this proposition they cite *People v. Roger Hedgecock for Mayor Com.* (1986) 183 Cal.App.3d 810 and *Community Cause v. Boatwright* (1987) 195 Cal.App.3d 562.  These cases relied on a Supreme Court case, *Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 421–422 (*Christiansburg*), which held a court must find a plaintiff's claims under title VII of the Civil Rights Act to be frivolous, unreasonable, or groundless to award attorney fees to the defendant.

Many years later, however, the Supreme Court considerably limited *Christiansburg* in *Fogerty v. Fantasy, Inc.* (1994) 510 U.S. 517 (*Fogerty*).  The *Fogerty* decision observed *Christiansburg*'s holding stemmed from its civil rights context: "Oftentimes, in the civil rights context, impecunious 'private attorney general' plaintiffs can ill afford to litigate their claims against defendants with more resources."  (*Fogerty*, at p. 524.)  The high court contrasted this special setting with a more typical civil litigation, where plaintiffs " 'can run the gamut from corporate behemoths to starving artists.' "  (*Ibid.*)  The same is true of prospective defendants, the court observed.

The statute in this case is not like the statute in *Christiansburg*.  It is more like the one in *Fogerty*.

California election law disputes are more like the ordinary civil litigation setting in *Fogerty*:  generalizations about plaintiffs and defendants are doubtful.  This is true in this case and as a general matter.

The statute here says the trial court *may* award to a plaintiff or defendant who prevails his costs of litigation, including reasonable attorney fees.  The statute means what it says.  As the *Fogerty* decision put it, prevailing plaintiffs and prevailing defendants are to be treated alike, and attorney fees are to be awarded to prevailing parties only as a matter of the trial court's discretion.  (*Fogerty*, *supra*, 510 U.S. at p. 534.)

We therefore uphold the trial court's exercise of its discretion to award attorney fees to the defendants, who were unquestionably the prevailing parties.

In their brief about the fees order, the respondents, excluding Nehrenheim, requested appellate sanctions against Travis, Voisey, and their counsel.  The appeal of the attorney fees was not frivolous.  We deny the request for sanctions.

## DISPOSITION

The judgment is void as to Redondo Beach Waterfront, LLC, Bruning, and Wardy. The judgment is otherwise affirmed. The August 7, 2019 award of attorney fees is affirmed. Redondo Beach Waterfront, LLC, Bruning, and Wardy shall recover their costs on appeal against Rescue Our Waterfront, P.A.C.; Brand; Brand for Mayor 2017; Moffat; Craig; and Nehrenheim. Rescue Our Waterfront, P.A.C.; Brand; Brand for Mayor 2017; Moffat; Craig; and Nehrenheim shall recover their costs on appeal against Travis and Voisey.


WILEY, J.


We Concur:


BIGELOW, P. J.


GRIMES, J.